UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 16-CR-20461-JEM(s)

UNITED STATES OF AMERICA

vs.

MILKA ALFARO,

        Defendant.
_____/

**STIPULATED FACTUAL BASIS**
**IN SUPPORT OF GUILTY PLEA**

      Beginning in or around 2011 and continuing through approximately June 2016, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, MILKA ALFARO (hereinafter referred to as the "defendant" or "ALFARO"), did knowingly combine, conspire and agree with other co-conspirators, in violation of Title 18, United States Code, Section 1349, to commit health care fraud, in violation of Title 18, United States Code, Section 1347, and to commit wire fraud, in violation of Title 18, United States Code, Section 1343, as alleged in Count 1 of the Superseding Indictment. ALFARO agrees that, had the case proceeded to trial, the United States would have been able to prove that the following facts happened in the Southern District of Florida, and elsewhere:

      ALFARO, together with her mother, Mildrey Gonzalez ("Gonzalez"), was a co-owner and operator of numerous home health care agencies that did business in Miami-Dade County and purported to comply with the rules and regulations of the Medicare program.

      MA Home Health Agency Inc. ("MA") was a Florida corporation that did business in Miami-Dade County, Florida as a home health agency purporting to provide services to Medicare beneficiaries.

      Golden Home Health Care, Inc. ("Golden") was a Florida corporation that did business in Miami-Dade County, Florida as a home health agency purporting to provide services to Medicare beneficiaries.

      Metro Dade Home Health, Inc. ("Metro Dade") was a Florida corporation that did business in Miami-Dade County, Florida as a home health agency purporting to provide services to Medicare beneficiaries.

*Court Exhibit #1*

Nova Home Health Care, Inc. ("Nova") was a Florida corporation that did business in Miami-Dade County, Florida as a home health agency purporting to provide services to Medicare beneficiaries.

Homestead Home Health Care, LLC ("Homestead") was a Florida corporation that did business in Miami-Dade County, Florida as a home health agency purporting to provide services to Medicare beneficiaries.

Finetech Home Health, Inc. ("Finetech") was a Florida corporation that did business in Miami-Dade County, Florida, as a home health agency purporting to provide services to Medicare beneficiaries.

Inar Home Care Service Corp. ("Inar") was a Florida corporation that did business in Miami-Dade County, Florida as a home health agency purporting to provide services to Medicare beneficiaries.

ALFARO, Gonzalez, and their co-conspirators at the above-named home health agencies paid patient recruiters, and caused patient recruiters to be paid, bribes and kickbacks in exchange for the referral of Medicare beneficiaries to the home health agencies, including beneficiaries that, in some cases, did not qualify for home health care services. The purpose of paying patient recruiters these bribes and kickbacks in exchange for referring Medicare beneficiaries to the above-named home health agencies was so that these home health agencies could bill Medicare for home health services. Had Medicare known that bribes and kickbacks were used to attract beneficiaries to the above-named home health agencies, however, it would not have paid any claims submitted on behalf of those beneficiaries. In addition, ALFARO, Gonzalez, and their co-conspirators paid bribes and kickbacks to medical professionals, including doctors, in return for provision of prescriptions for home health care services and referrals of Medicare beneficiaries to the home health care agencies that ALFARO and Gonzalez owned and controlled. Again, had Medicare known that home health care referrals and claims were procured through payment of bribes and kickbacks to medical professionals, it would not have paid any of those claims.

ALFARO, Gonzalez, and their co-conspirators also recruited and paid others, including, but not limited to, Juan Castillo Mayedo and Ramon Collado, to falsely and fraudulently represent themselves to be the owners of Homestead, Finetech, Nova, MA, Golden, Inar, and Metro Dade. These nominee owners were used for the purposes of hiding the identities of ALFARO and Gonzalez, who organized and participated in the fraud at these home health agencies. At ALFARO and Gonzalez's direction, their co-conspirators prepared and submitted for approval Medicare applications that fraudulently misrepresented the identities of the facilities' true owners and completely failed to disclose either ALFARO or Gonzalez's ownership interests in the home health agencies, contrary to Medicare's requirements. ALFARO, Gonzalez, and their co-conspirators then caused Homestead, Finetech, Nova, MA, Golden, Inar, and Metro Dade to submit false and fraudulent claims to Medicare seeking payment for home health care services without disclosing the identities of the owners and individuals with security interests in these home health agencies—i.e., ALFARO and Gonzalez. In addition, ALFARO and Gonzalez directed the nominee owners of to open bank accounts for the above-listed home health care agencies, and worked with their co-conspirators to create signature stamps bearing the nominee owners' names, which were

routinely used on checks and for the purpose of further directing disbursement of funds received from Medicare.

ALFARO actively participated in the conspiracy by, among other things, co-owning and operating MA, Metro Dade, Golden, Finetech, Inar, Homestead, and Nova; concealing her ownership interests from Medicare and her involvement in the scheme by paying co-conspirators, including Juan Castillo Mayedo, Ramon Collado, and others, to serve as nominee owners of the above-named home health agencies; causing bribes and kickbacks to be paid to medical professionals and patient recruiters in return for referrals of Medicare beneficiaries; directing co-conspirators, including Luis Luzardo and Julio Velazquez, to open corporations into which millions of dollars' worth of fraud proceeds were funneled; and attempting to influence potential testimony of witnesses against her at trial, including Luis Luzardo, Julio Velazquez, and B.A., in violation of her pretrial conditions of release and the law. ALFARO further acknowledges that, at a proceeding before U.S. Magistrate Judge Jonathan Goodman on July 26, 2016, despite having testified and sworn, under oath and under penalty of perjury, that a financial affidavit submitted to the Court was accurate, at that time, in truth and in fact, the financial affidavit submitted by ALFARO was inaccurate, in that it failed to fully disclose and did not accurately reflect ALFARO's assets and liabilities, and claimed, falsely, that she only had $700 to her name.

During the time ALFARO was involved in the conspiracy at MA, Metro Dade, Golden, Finetech, Homestead, Inar, and Nova, Medicare paid the home health agencies more than at least approximately $20,000,000 as a result of false and fraudulent claims that ALFARO, Gonzalez and their co-conspirators caused to be submitted to the Medicare program. ALFARO acknowledges that the fraudulent claims were submitted and paid using interstate wires.

ALFARO, Gonzalez and their co-conspirators utilized those proceeds—i.e., the more than $20,000,000 paid by Medicare as a result of false and fraudulent claims—as to each of the assets identified as "directly forfeitable assets" in ALFARO's Plea Agreement. Such utilization included depositing the proceeds of the false and fraudulent claims into accounts controlled by Gonzalez and ALFARO. The accounts that received the Medicare proceeds, whether directly or indirectly, include all of the accounts identified in paragraph 17, subparts (a) through (j), of ALFARO's Plea Agreement. Additionally, the proceeds contained in those accounts, as well as accounts not otherwise specifically identified in ALFARO's Plea Agreement, were used to purchase and/or make mortgage payments and/or pay property taxes and/or make home improvements upon the real properties identified in paragraph 17, subparts (k) through (p) of ALFARO's Plea Agreement. As such, each of the assets identified as "directly forfeitable" constitutes or is derived, directly or indirectly from gross proceeds traceable to the conspiracy. Additionally, the gross proceeds of the conspiracy scheme totals at least approximately $20,000,000.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for a guilty plea to the charges against me. It does not include all the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily because I am in fact guilty, as charged in the Superseding Indictment.

Date: 3/2/17

MILKA ALFARO,
Defendant

Date: 3/2/17

MARC SEITLES, ESQ.,
Attorney for the Defendant

Date: 3/2/17

LISA H MILLER
Trial Attorney, U.S. Department of Justice